## Cooper, Appellant, *v.* Reading.

Argued April 25, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Charles H. Weidner,* with him *John V. Boland* and *Stevens & Lee,* for appellant.

*C. Wilson Auston,* city solicitor, and *George B. Balmer,* with them *Robert S. Shapiro,* assistant city solicitor and *Snyder, Balmer & Kershner,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May 2, 1958:

The instant trespass actions were instituted by the appellant, Samuel Cooper, acting in a representative capacity as administrator of the estates of his two deceased sons, to recover damages arising from their accidental deaths by drowning. The appellees, the City of Reading and the Pennsylvania Railroad Company, were named as defendants in the actions. The appellant's complaint contained four counts and asserted a cause of action against the appellees in the case of each son under both the Death Act[1] and the Survival Act.[2] Neither appellee filed an answer.

In 1911 the City of Reading constructed a large outlet pipe, six feet in diameter, for the purpose of carrying off waters trapped by its storm sewer system in the southern part of the City. The City obtained an easement which permitted it to discharge the water from this outlet pipe into the Schuylkill Canal which, at that time, ran parallel to the east bank of the Schuylkill River in the City. The canal was then in general use as a navigable waterway and the waters discharged from the pipe were carried off as part of its flow. About 1931, however, the use of the canal as a waterway was discontinued; it became largely dried up and was filled in with earth in places.

---

[1] Act of April 15, 1851, P. L. 669, §19, 12 PS §1601; Act of April 26, 1855, P. L. 309, §§1, 2, as amended, 12 PS §§1602, 1603; Act of May 13, 1927, P. L. 992, §1, 12 PS §1604.

[2] Act of April 18, 1949, P. L. 512, art. VI, §§601, 603, 20 PS §§320.601, 320.603.

The City of Reading continued to discharge its storm drainage water into the bed of the former canal through the pipe it had constructed under the grant of its easement. Over a period of years the water emerging from the pipe has flowed into the bed of the former canal and formed a pool at the pipe outlet. This pool runs in a north-south direction and is about 50 feet long and 41 feet wide. The pool is comparatively shallow around its edges but near the center the constant flow of water from the City's outlet pipe has eroded the former canal bed and caused the formation of a hole approximately 16 feet deep.

Although the canal bed is concededly owned by the Commonwealth, the water has eroded the east side of the canal bed to the extent that for 20 feet along its east side the pool encroaches upon property owned by the Pennsylvania Railroad Company which adjoins the canal bed. This encroachment is crescent-shaped and extends only seven feet onto the property of the railroad at its widest point.

Children living in a residential area some distance from the canal bed have played on the railroad lot for many years. The pool, too, has long been used by children, both for swimming in the summer and sliding in the winter. Both the railroad lot and the pool were unfenced and easily accessible to children. No attempt had ever been made to block approach to the pool in spite of the fact that a child had drowned in the pool three years before the instant accident.

On a cold Sunday afternoon, February 4, 1951, the appellant's two sons, Albert, nine, and James, six, went to the vicinity of the pool with four other boys. For a time they amused themselves by sliding on the ice which covered the pool and by throwing rocks upon its surface to see if they could break it. Appellant's children had visited the pool on several occasions pre-

viously but apparently did not know of the existence of the deep hole in its center. The children left the pool for a time but later returned and went out on the ice from the west bank of the pool. In the course of their play one of the boys called attention to a shiny object on the ice near the center of the pool and the Cooper boys and one other child began edging out onto the ice to get it. The ice broke beneath young Albert Cooper and he fell into the pool. While attempting to extricate Albert from the water his brother James and the other boy also fell in—the Cooper boys drowned but the other child was saved.

The jury returned verdicts of $1200 in each of the death actions and verdicts of $6000 and $7800 in the survival actions. The majority of the court below granted appellees' motions for judgments n.o.v., holding: (1) that the pool was not an artificial structure which involved an unreasonable risk of harm to children within the meaning of the Restatement, Torts, §339; (2) that the negligence of the appellees, if any, was not the proximate cause of the accident; (3) that the appellee railroad could not, in any event, be held liable because there was no credible evidence that the accident occurred on the railroad's property; (4) that the City of Reading was absolved from any negligence on its part because the maintenance of the pipe was the exercise of a governmental function.

It is clear that the determination of the instant case depends in the first instance upon whether the appellant's testimony, interpreted in the light most favorable to his contentions, is sufficient to bring the case within the rule of law enunciated in §339 of the Restatement, Torts. This section has been adopted by this Court: *Dugan v. Pennsylvania Railroad Company,* 387 Pa. 25, 31, 127 A. 2d 343; *Thompson et al. v. Reading Company,* 343 Pa. 585, 23 A. 2d 729.

Section 339 provides: "A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

We are of the opinion that the learned court below correctly entered judgment n.o.v. in favor of the appellee railroad. Whether the accident occurred on the slight portion of the pool which encroached upon the railroad's lot or not, the application of the doctrine of §339 of the Restatement, Torts so as to impose liability upon the railroad under the facts here presented would be an unwarranted extension of a rule which this Court has always insisted should be kept within proper bounds.[3]

This doctrine, by its express terms, applies *only* where a possessor of land has *maintained* upon that land the structure or artificial condition which has caused harm to children. There is no evidence whatever that the railroad either created or maintained the

---

[3] *Dugan v. Pennsylvania Railroad Company*, 387 Pa. 25, 33, 127 A. 2d 343, supra; *Gallagher v. Frederick*, 366 Pa. 450, 455, 77 A. A. 2d 427.

condition which existed here. In point of fact, all of the evidence presented clearly shows just the contrary —that the pool existed on the railroad's lot only by reason of erosion and trespass by the City. We are not unmindful that in *Gallagher v. Frederick,* 366 Pa. 450, 455, 77 A. 2d 427, supra, we held that a landowner may be said to maintain an artificial condition on his land which another person has created but which the owner has allowed to exist. As support for this same proposition the appellant cites the comment to §877(b) of the Restatement, Torts. However, both these authorities obviously refer to conditions the presence of which the landowner *knows* and *permits* to exist. In the instant case there is not a scintilla of evidence that the railroad had any actual knowledge that the pool had encroached upon its land. Nor have we been referred to any authority holding that a landowner has a legal duty to search out, discover and guard against such a trespass upon his land. In the instant case there was no evidence from which the jury could find that the railroad either maintained the pool or permitted the City of Reading or anyone else to maintain it on its land.

The only real question regarding the railroad's liability is whether the railroad can be said to have had such constructive knowledge of the presence of this encroachment upon its land that it should be held to have "maintained" it by reason of its failure to take action to cause its removal.

On this question evidence was introduced that the railroad's lot had been used by children as a playground and that over a period of time they had worn easily visible paths through the brush which covered it. This evidence, however, is not determinative of the question of whether the railroad had either actual or constructive notice of the encroachment of the pool.

It is true that the pool and the lot are both located in a built-up area of the City of Reading, but the pool lies a full city block from the nearest city street, a street primarily used for business, not residential, purposes. No use of the lot by the railroad was shown and the pool is not visible from the street. In fact, although the appellant and his wife had heard of the pool, neither of them knew where it was located. The only indication of any railroad activity in the area was that one of its tracks ran nearby, but the appellant failed even to show any current use of this track by the railroad. In short, there was nothing in either the physical condition of the lot or its use by the railroad which could afford a basis for a reasonable inference that the railroad should have had notice either that the pool had spread onto its property or that such pool was being put to use as a playground by the children who trespassed upon the railroad lot. The appellant places great reliance upon *Altenbach v. Lehigh Valley Railroad Company,* 349 Pa. 272, 275, 37 A. 2d 429, upon the question of notice. In that case, however, the railroad not only knew of the existence of the body of water in which the accident occurred, a reservoir, but had actually constructed it for use in its operations. Under those circumstances the railroad was of course liable for injury to children it allowed to trespass on the premises. This is quite different however, from the instant situation where the railroad not only did not construct or use the pool, but where also there was no proof that it even knew of its existence and proof that the very presence of the pool upon its property was an act of trespass.

The appellant further argues that the railroad should be held to notice of the existence of the pool because of the fact that another child had drowned in the same pool three years before the instant acci-

dent. There is no evidence, however, that the railroad was ever notified of this accident and the appellant did not support his contention that the drowning was widely publicized at the time of its occurrence by any proof at trial. The record in the instant case affords no basis for a finding that anyone connected with the railroad knew of the prior drowning in the pool. We can only conclude that the appellant's evidence falls far short of proving that the railroad knowingly permitted this pool to encroach upon its lot after having had actual or constructive notice of such encroachment and, in the absence of such proof, the railroad cannot be held to have maintained this artificial condition upon its land within the meaning of §339 of the Restatement, Torts. Consequently, the learned court below correctly entered judgment n.o.v. in favor of the appellee railroad.

The City of Reading argues now, as it did in the court below, that it did not own the land covered by the pool; that, therefore, it was not a "possessor of land" within the meaning of §339 of the Restatement, Torts and consequently had no duty to guard against injury to trespassing children. The parties concede that the City does not own the canal bed and has only an easement which permits it to discharge storm water from its outlet pipe which empties into the canal bed. The City's contention was correctly answered by the learned trial judge, who stated in his dissenting opinion: "This argument must fall because children had played for years in and on a pool of the City's concentrated storm water which the City had, by grant from the owner of land, obtained the right to discharge there. After the canal was filled up and discontinued, the City, within the purpose of its easement, possessed some control over the place of discharge, in order to safeguard and repair it for the purposes of efficiency

and safety. The identity of the owner of the canal bed at any time in the last fifty years is not divulged, nor the terms of the original easement, but the City had an easement. That is not denied; it was used continuously, and by fair inference has never been disturbed. The City possessed the ordinary power of an easement-holder to secure and make safe its exercise of rights, and for that purpose to enter the bed at the spot of discharge, and make reasonable alterations or repairs." The City completely controlled the land upon which the pool is located by the manner in which it exercised its easement. It must, therefore, be held to the duties of a "possessor of land" and subject to liability if the four requirements of §339 are present in the instant case.[4]

There can be little doubt that the City knew or should have known that the pool was a place where children were likely to trespass. The evidence reveals that large numbers of children had regularly played in and about the pool for years and that a police report of the prior drowning in the pool had been filed with the City. The outlet pipe was an integral part of the City's expensive storm drainage system and was in current and everyday use. Under these circumstances there was adequate evidence to go to the jury on the question of knowledge by the City. Cf. *Jennings v. Glen Alden Coal Company*, 369 Pa. 532, 536, 87 A. 2d 206, supra; *Altenbach v. Lehigh Valley Railroad Company*, 349 Pa. 272, 275, 37 A. 2d 429, supra.

Whether the City knew or should have known of the condition and that it involved an unreasonable

---

[4] Liability may only be imposed where all of the requirements of the section are present: *Dugan v. Pennsylvania Railroad Company*, 387 Pa. 25, 32, 127 A. 2d 343, supra; *Jennings v. Glen Alden Coal Company*, 369 Pa. 532, 535, 87 A. 2d 206; *Verrichia v. Society Di M. S. Del Lazio*, 366 Pa. 629, 631, 79 A. 2d 237.

risk of death or serious bodily harm to trespassing children is a more difficult question. Our courts have held that " 'ponds, pools, lakes, streams and other waters embody perils that are deemed to be obvious to children of the tenderest years' " (*Murdock v. Pennsylvania Railroad Company*, 150 Pa. Superior Ct. 156, 169, 27 A. 2d 405) and that "a pool or pond is not an attractive nuisance where there is no unusual danger" (*Irwin Savings & Trust Company v. Pennsylvania Railroad Company*, 349 Pa. 278, 282, 37 A. 2d 432).[5] Under certain circumstances, however, a body of water may present such an unusual danger that its maintenance without proper safeguards involves an unreasonable risk to trespassing children.

In the instant case the jury was justified in finding that the pool which the City allowed to form presented just such an unreasonable risk. Here, neither the appearance of the canal bed nor the land around it gave any indication that the pool concealed a "step-off" 16 feet deep in its center. Children could play in the water at its edges or upon the ice covering it without ever learning that it was anything more than what it appeared to be—an oversized puddle which had formed at the terminus of the pipe. The very fact that the pool was deceptively shallow at its edges and therefore innocent in appearance is the factor which created the unreasonable risk of harm to unsuspecting child trespassers. Whether the City exercised proper care in permitting the pool to exist in this condition, without giving any warning to the children it knew or should have known were using it as a place of recrea-

---

[5] See also: *Ansell v. Philadelphia*, 276 Pa. 370, 120 A. 277; *Gillespie v. McGowan*, 100 Pa. 144; *Pietros et ux. v. Hecla Coal & Coke Company*, 118 Pa. Superior Ct. 453, 180 A. 119; *Dornick et ux. v. The Wierton Coal Company*, 109 Pa. Superior Ct. 400. 167 A. 617.

tion, was a question of fact and properly submitted to the jury for determination. Cf. *Altenbach v. Lehigh Valley Railroad Company*, 349 Pa. 272, 277, 37 A. 2d 429, supra; *Barthold v. Philadelphia*, 154 Pa. 109, 110, 26 A. 304.

The City contends that the children realized the risk of going out upon the ice and, therefore, the third requirement of §339 is absent. This contention is based upon the evidence that Albert, the older of the Cooper boys, indicated caution as he crossed the ice by stamping his feet to test whether it would maintain his weight. There was no evidence that Albert knew the actual depth of the pool or of the peril in which he was placing himself. The Cooper boys had been to the pool on only a few previous occasions and upon those visits they might well have seen children wading or even swimming in the pool without realizing that its depth was anywhere near the 16 feet to which it plunged in the center. There is no indication that Albert was doing anything other than exercising the normal caution which any child (or even an adult) can be expected to display when walking upon ice in cold, freezing weather.

An older person could reasonably be expected to realize the danger inherent in crossing an ice covered pool, but we cannot judge the conduct of these young children by adult standards. In *Patterson v. Palley Manufacturing Company*, 360 Pa. 259, 267, 61 A. 2d 861, this Court stated: "Generally speaking, however, the care and caution required of a child is measured by his capacity to see and appreciate danger, and he is held only to such measure of discretion as is usual in those of his age and experience; this being necessarily a varying standard, the question is ordinarily one for the jury and not for the court . . ." Under the circumstances here presented we are unable to declare,

as a matter of law, that the Cooper boys either realized or should be expected to have realized the risk inherent in their conduct. See also: *Kuhns v. Brugger,* 390 Pa. 331, 339-342, 135 A. 2d 395, and cases therein cited.

It is clear that the final requirement of §339, i.e. that the utility to the City of maintaining the condition was slight as compared to the risk to young children, is present in the instant case. The pool itself has no utility to the City and the danger it caused could have been easily eliminated at no great cost. The hole in the center of the pool could have been filled in or an apron placed beneath the pipe to eliminate the erosive effect of the emerging water and cause its flow southward in the canal bed. If either of these things had been done the water would never have become deep enough to constitute a threat to children. Even the placing of warning signs might have been of some aid in removing the danger. At any rate, the jury was clearly justified in finding that the City's total failure to take any action constituted negligence under the circumstances here presented.

The City contends, and the majority of the lower court agreed, that, even assuming that the City was negligent, such negligence did not constitute the proximate cause of the accident. As support for this proposition both the City and the court below rely upon *Irwin Savings & Trust Company v. Pennsylvania Railroad Company,* 349 Pa. 278, 37 A. 2d 432, supra, where we denied liability for drownings which occurred when children crossed a pond which the defendant had negligently allowed to form by failing to properly maintain a culvert beneath its tracks. The children had attempted to cross the ice covering this pond to release a kite which had caught in a tree. This Court stated, at p. 284: "It is too much to suppose that a prudent man, of ordinary intelligence, exercising due

care, and with the responsibility that was upon defendant, could have anticipated and foreseen this unfortunate happening. It would be impossible for anyone to visualize the actual occurrence, the children running out upon the ice in pursuit of the kite, . . . and the giving way of the ice and the tragedy that followed." And at p. 285: "The act of the children themselves in chasing their kite over the ice was the direct, proximate cause of the accident." The instant case is obviously distinguishable from the situation before this Court in the *Irwin* case. The children in the *Irwin* case were not playing upon the ice at the time of the accident and the manner in which the accident occurred could not reasonably have been foreseen by the defendant therein. In the instant case exactly the converse is true. The Cooper children and their companions had been playing on the ice off and on for some time prior to the happening of the accident and the City, as we have previously determined, knew or should have known that the pool had been used in just this fashion for some time past. That playing children will go out of their way to investigate any object which attracts their attention for even a moment is too self-evident to require discussion. The behavior of the children in the instant case cannot seem other than natural and foreseeable to anyone who has ever observed children at play. The argument that the City's negligence cannot be considered the proximate cause of the accident in the instant case is clearly without merit.

As its final reason for entering judgment n.o.v. in favor of the City, the lower court held that the City was absolved from any liability for its negligent acts because in maintaining its storm drainage project it was acting in the course of its public or governmental functions as distinguished from its proprietary or busi-

ness functions. The evidence in the instant case affords no basis for such a holding. The City's negligence consisted solely of its sufference of a dangerous condition upon land it controlled without affording any safeguards against harm to children trespassing thereon. The City did not create the pool in pursuance of its storm drainage project; it merely passively allowed the water, after it had disposed of it, to form into a pool upon the land it controlled by reason of its easement. Under these facts, it cannot be said that the City was engaged in the performance of a governmental function. That a municipality is legally responsible for the maintenance of its land in a safe condition to the same extent as any private owner is clear beyond question: *Hill v. Allentown Housing Authority*, 373 Pa. 92, 96, 95 A. 2d 519. As we have stated previously, the City's control over the land here involved through the exercise of its rights under its easement is sufficient to impose upon it the duties and liabilities of an owner of property.

The entry of judgment n.o.v. in favor of the Pennsylvania Railroad is affirmed. The judgment n.o.v. entered in favor of the City of Reading is reversed, the verdict reinstated, and judgment entered thereon.

Mr. Justice BELL concurs in the affirmance of judgment n.o.v. in favor of the Pennsylvania Railroad but dissents to the entry of judgment against the City of Reading.

Mr. Justice MUSMANNO and Mr. Justice COHEN concur in the judgment entered against the City of Reading but dissent to the affirmance of judgment n.o.v. in favor of the Pennsylvania Railroad Company.